IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JONATHAN M. CARNEY, | ) | |
| | ) | |
| Plaintiff, | ) | 4:09CV3043 |
| | ) | |
| V. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | MEMORANDUM AND ORDER |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff Jonathan M. Carney ("Carney") seeks review of a decision by the defendant, Michael J. Astrue, the Commissioner of the Social Security Administration ("Commissioner") denying his application for disability insurance benefits under Title II of the Social Security Act and for the payment of Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 et seq. After carefully reviewing the record, the Commissioner's decision will be affirmed.

## I. PROCEDURAL BACKGROUND

Carney applied for social security disability benefits on December 14, 2005, claiming asthma, borderline mental functioning, and other mental conditions or disorders rendered him disabled and unable to work since December 21, 2004. Social Security Transcript ("TR") at 29, 55-57, 63 & 216. His application for disability benefits was denied initially on February 8, 2006, (TR 33-37), and upon reconsideration on April 12, 2006. TR 39-43.

Carney filed a hearing request on April 18, 2006. TR 45-46. A hearing was held before an Administrative Law Judge ("ALJ") on February 28, 2008, and testimony was received from Carney, and from a vocational expert ("VE") who

appeared at the ALJ's request. Carney was represented by counsel at the hearing.  TR 210-257.

The ALJ's adverse decision was issued on July 7, 2008, (TR 12-21), and Carney's  request for review by the Appeals Council was denied on December 30, 2008.  TR 5-7.  Jordan's pending complaint for judicial review and reversal of the Commissioner's decision was timely filed on January 29, 2009.  Filing No. 1.

## II.   THE ALJ'S DECISION.

The ALJ evaluated Carney's claims through the sequential analysis prescribed by 20 C.F.R. §§ 404.1520 and 416.920, (TR 82-90), and found:

1.     Carney met the insured status requirements of the Social Security Act through March 31, 2008.

2.     Carney did not engage in substantial gainful activity at any time since December 21, 2004, the date he claims he became unable to work.

3.     Carney has the following severe impairments:  borderline intellectual functioning, antisocial personality disorder, asthma, Level II obesity, and a history of substance abuse.

4.     Carney does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.     Based on the entire record, Carney has the residual functional capacity to perform unskilled work at a medium level of exertion, subject to no more than occasional climbing and crawling, with the need to avoid

concentrated exposure to cold, humidity or fumes due to mild asthma, and he is able to follow simple routine instructions that do not require extended concentration, with no more than occasional brief or superficial social interaction with co-workers or the general public.

6.      Carney's testimony, insofar as it attempted to establish total disability, was not credible in view of the criteria set forth under 20 CFR 404.1529, 20 CFR 416.929, Social Security Ruling 96-7p, and Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir.1984).

7.      Carney is capable of performing past relevant work as a kitchen helper/dishwasher.

8.      Carney has not been disabled, as that term is defined under the Social Security Act, from December 21, 2004 to the date of the ALJ's decision.

TR 14-20.

## III.   ISSUES RAISED FOR JUDICIAL REVIEW.

Carney claims the ALJ's decision was incorrect for the following reasons:

1.      The ALJ incorrectly evaluated Carney's subjective complaints and failed to set forth adequate justification for discrediting Carney's testimony;

2.      The ALJ failed to follow or properly discredit the opinions of Dr. Helen Montoya, Ph.D., the state agency medical consultant who examined the medical records and concluded the plaintiff had a moderately limited ability to deal with most circumstances encountered in the work setting;

3.      The ALJ did not properly develop the record by failing to subpoena the records of psychological testing and evaluations performed on the plaintiff at the Lincoln Regional Center in 1997; and

4.      The ALJ failed to pursue additional psychological testing recommended by the consulting examiner.

Filing No. 17, at CM/ECF pp. 10-11.

## IV.   THE RECORD AND PROCEEDINGS BEFORE THE ALJ.

As of February 28, 2008, Carney was twenty-eight years old, and did not have a high school diploma or a GED.  TR 218-19.  Carney had difficulty performing well in middle school and high school, and was placed in special schooling programs, including the "Two and a Half Program" or "C.O.R.E," a program for students "with behavior disorders who experience limited success in the regular or special education classes."  TR 112.  Carney withdrew from or failed all his C.O.R.E. classes during the 1996/1997 school year.  TR 113-120, 219.  He is able to read, but is not proficient at writing and spelling.  TR 89-92, 235-36.

Between the ages of fourteen and eighteen, Carney was in juvenile detention four separate times on various charges, (e.g., assault, vandalism, disturbing the peace, breaking and entering, shoplifting, car theft), which were adjudicated under the supervision of the Special Juvenile Court of Lancaster County, Nebraska.  TR 185, 220-222.  When Carney was facing theft charges in 1997, he was admitted to the Lincoln Regional Center ("LRC") for three days to undergo a court-ordered mental health evaluation.  LRC did not treat Carney, and its mental health evaluation record was not provided to or retrieved by the ALJ for her review and consideration of Carney's social security claim.  TR 186, 222.

A mental health evaluation was performed by William R. Stone, Ph.D. on September 24, 1997 to determine if Carney was eligible for disability benefits. In 1997, Carney told Dr. Stone he had worked at Burger King for six or seven months, but quit due to mistakes in computing his pay. He stated he was attending GED classes, but was required to be there at 9:00 a.m., which he considered "pretty early," since "he usually gets up at 10:30 or 11:00 in the morning and typically goes to bed around 3:00 or 4:00 the following morning." TR 174. Carney indicated "no family history of mental or emotional problems," and stated "he was not abused or mistreated as a child and . . . was generally happy." TR 174. He denied thoughts of suicide, depression, or anxiety. Carney accurately described his history of poor and disorderly performance in school. In his 1997 statements to Dr. Stone, Carney denied any personal history of significant substance use, and explained he had drank alcohol only one time and had used marijuana only once. Dr. Stone performed psychological testing in 1997, and although Carney's effort may have been less than optimal, and he tested as having borderline intellectual functioning, (WAIS-R IQ: 80; V: 82; P: 82), there was nothing to support a diagnosis of active mental or emotional disorder. Dr. Stone concluded Carney had an attitude problem, but from a mental health perspective, he was psychologically capable of performing basic daily living tasks; maintaining adequate social contacts; sustaining concentration and attention; understanding, remembering, and carrying out short and simple instructions; relating appropriately to co-workers and supervisors; adapting to day-to-day changes; and managing his own funds, though perhaps not wisely. TR 176-177.

There are no medical or mental health treatment records for the period between September 1997 and February 21, 2004. Carney was employed as a dishwasher for Valentino's Pizza in Lincoln, Nebraska from June 1999 until November 2002. Although he was able to maintain this position for two and one-half years, Carney

claims he would have been fired within a week had he not been working with his mother, who covered for him at the job.[1]   TR 229.

On December 21, 2004, Carney sought treatment from the Community Mental Health Center of Lancaster County.   TR 184-85.   Carney reported depression, ongoing social anxiety, irritability, moodiness, and insomnia.   The mental health provider reported Carney was alert and oriented, and had no formal thought disorders, but his attention span, recall, insight, judgment, and impulse control were poor. Carney was prescribed Paxil and Seroquel.   TR 185.

When Carney was next seen at Community Mental Health on February 10, 2005, he reported the prescribed Seroquel was effectively treating his anxiety attacks, but he remained unable to sleep at times.   The Paxil and Seroquel prescriptions were increased.   TR 183.   By March 3, 2005, Carney reported less difficulty with depression and social anxiety, and stated he was looking for a job and going to school to get his GED.   TR 182.   On April 28, 2005, Carney's mood was much improved, and he was experiencing less social anxiety, but he was still having difficulty sleeping.   The Seroquel prescription was increased, and since samples of Paxil were not available, Carney was given Lexapro instead.   TR 181.   Carney was "tolerating his meds well," (TR 181), and by June 2, 2005, was "doing pretty well" on medication, although he was still suffering from some situational depression and anxiety. TR 180.   After receiving medication to treat his symptoms of depression and anxiety, Carney began attending GED classes.   Carney did not earn his GED.   In his testimony at the social security hearing, Carney explained he quit attending the GED classes because they were "a joke," and no one explained the material.   TR 182, 238.

---

[1]Carney performed other jobs for brief periods of time, (e.g. Burger King and Matt Talbott Kitchen), but since ALJ did not consider these positions when determining the Carney's past relevant work experience, (247-49), the tasks performed during these jobs will not be further discussed.

Carney also "just quit" showing up for scheduled appointments at Community Mental Health, and was a "no show" for his appointments on June 30, 2005 and July 20, 2005.  TR 178-179, 238.  Although he testified he stopped attending treatments because Seroquel made him feel like a "zombie," Carney never contacted his mental health provider to report any adverse side effects and never requested a change of medication.  TR 238-39.

Carney applied for social security benefits on December 14, 2005.  In his interrogatory responses completed on December 27, 2005, Carney stated he last saw a doctor in October 2005, and he was taking Lexapro, Paxil, and Seroquel as prescribed.  TR 91.  Carney's interrogatory responses also stated he had no interest in any hobbies, was watching crime stories on television for six hours at a time, and was smoking pot for relaxation and recreation.  TR 90.

At the request of Disability Determination Services, Carney was examined again by Dr. Stone on January 6, 2006.  Carney apparently did not recognize or remember Dr. Stone from the previous examination conducted in 1997 when Carney was nearly eighteen.  During the January 2006 examination, Carney stated his father was mentally abusive when Carney was a child.  Carney stated that at the age of thirteen or fourteen, he began seeing things, hearing things, and losing track of time, walking around aimlessly and for great distances (as far as "fifty blocks"), and rocking excessively for hours.  Carney stated he started burning himself at the age of fifteen, and claimed he still sucks his thumb.  Carney admitted he did not tell Community Mental Health about all his symptoms when receiving treatment at that facility, and explained he was not satisfied with his treatment at that facility because the provider merely "listened for five minutes and wrote a prescription."  TR 192.  Carney claimed he lost his sex drive while taking Seroquel and Paxil, and was afraid of losing control over his sexual impulses, which based on his self-reports, included bisexual orientation, an urge to masturbate in public, and a sexual attraction to children.  As an example of his claimed propensity to lose time, Carney told Dr. Stone

-7-

he was sitting on a park bench at noon one day, and the next thing he recalled was being naked in downtown Lincoln with his clothes located a block away. Carney said no one stopped him for being nude in public.

Carney stated that although he quit using drugs and drinking when he became homeless at age twenty-two, he began smoking pot and drinking alcohol at the age of twelve or thirteen. Contrary to his statements to Dr. Stone in 1997, Carney told Dr. Stone in 2006 that between the ages of sixteen and eighteen, he was frequently partying and hanging out with a rough crowd, and was using a variety of drugs, including methamphetamine, cocaine, LSD, and "shrooms." Carney also stated he had used LSD forty or fifty times over a three to four year period, and had a couple of bad trips, resulting in flashbacks two or three times a month; was shooting methamphetamine for a year and one-half; and used cocaine daily from the age of sixteen or seventeen until he was twenty-two. Dr. Stone noted that the history of substance abuse described in 2006 could explain Carney's reported hallucinations, however:

> If the history of substance use he gives now is accurate it is difficult to see why he would have suddenly stopped using substances when he started living on the streets, or why he would not have gone back to abusing substances once he had a residence.

TR 195.

Dr. Stone's mental examination report states:

> Mr. Carney's veracity regarding his symptoms, current and historical, is in considerable doubt. While the basic factual information of his personal and medical history is substantially unchanged since I saw him [in 1997], the history he relates of psychiatric symptoms is almost entirely different. He is indicating that as recently as when he consulted the Community Mental Health Center he was telling the other version

-8-

of his psychiatric symptoms and was not honest with them.  He states that he is being honest now, but I do not have any way of ascertaining with certainty which account is in fact accurate.  When I discussed it with him specifically he seemed to be saying "Trust me," basically.  This does not seem an adequate resolution with an individual who has a history of antisocial and criminal behavior.

TR 194-195.    Dr. Stone did not observe "behavior indicating the presence of hallucinations or delusions. TR 195.  Despite Carney's statement that "he can't live in reality," Dr. Stone concluded Carney's reality contact was "grossly intact," and he "seemed realistically oriented toward the disability process throughout the examination."  TR 195.

Ultimately, Dr. Stone concluded:

I cannot provide a diagnosis with a reasonable degree of psychological certainty with the conflicting information available.    Too much ambiguity exists regarding the veracity of his varied reports of symptoms, current and historical, to allow definitive diagnoses.

TR 196.  Dr. Stone explained Carney's test scores consistently indicated borderline intellectual functioning; he had a consistent history of antisocial behavior originating during his developmental years and continuing into adulthood, with a likely diagnosis of Mixed Personality Disorder with Antisocial Features; and Carney consistently reported marijuana use.  However, regarding Carney's statements of past heavy drug use; sexual behaviors, impulses,  and attractions; and lack of awareness of activities being performed, Dr. Stone suspected fabrication and exaggeration for economic gain.  Dr. Stone commented that the past evaluation from LRC may be informative, and administering the MMPI-2 and Rorschach tests may be useful, in determining whether and to what extent the history reported by Carney to Dr. Stone in 2006 was accurate.  TR 197.

Dr. Stone concluded Carney is capable of performing basic daily living tasks, and can maintain concentration and attention, understand, remember, and carry out the testing instructions, and manage funds, though perhaps not in a socially acceptable way. However, Carney has a history of conflict with authority, and by his self-description, does not adapt well to environmental changes. TR 198.

Carney had a history of childhood asthma, but had not sought treatment for this problem for the ten years prior to filing his social security claim. He was therefore examined by Scott McPherson, M.D. on January 10, 2006. Carney stated he had severe childhood asthma, but it had improved at the age of sixteen or seventeen. He claimed it became worse again during the two-year period prior to filing for social security benefits. Carney complained of shortness of breath with exertion, and stated activities such as breathing cold air, physical exertion, and assembly line work had exacerbated his asthma in the past. Carney stated he occasionally used Primatene Mist, an over-the-counter medication, for his asthma.

Upon examination, Dr. McPherson heard significantly decreased breath sounds in all lung fields and expiratory wheezes throughout Carney's lung field, but no audible crackles. Carney coughed occasionally during the interview, but did not appear short of breath. Dr. McPherson urged Carney to seek further health care through avenues available in Lincoln. Carney stated he smokes one to one-and-a-half packs of cigarettes a day, and he knew smoking exacerbates asthma, but he did not plan to quit. TR 189-190.[2] Carney was still smoking a pack of cigarettes a day at the time of his hearing on February 28, 2008. TR 245.

During the examination by Dr. McPherson, Carney said he hears voices, gets angry at other people, and although he was not presently suicidal or homicidal, he has

---

[2]In his interrogatory responses dated February 11, 2008, Carney stated no doctor ever advised him to quit smoking. TR 128.

wanted to hurt himself and others in the past.  Carney told Dr. McPherson that he drinks very little, but contrary to his statements to Dr. Stone four days earlier, stated he still smokes marijuana recreationally.  Carney denied any other current drug use, but admitted heavy drug use in the past.  TR 188.

Based on her examination of Carney's records, Helen Montoya, Ph.D. completed a mental RFC evaluation of Carney on February 3, 2006.  TR 158-161. Dr. Montoya's report states Carney has borderline intellectual functioning, an anxiety disorder, a personality disorder with antisocial features, and a history of marijuana and polysubstance abuse.  Dr. Montoya noted Carney's inconsistent self reports raised accuracy issues, and significant substance abuse may also be interfering with Carney's daily functioning.

Subject to these unresolved credibility concerns, Dr. Montoya found Carney had a moderately limited ability to understand, remember and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain attendance, be punctual, or complete a normal work week at a consistent pace without unreasonable interruptions; sustain an ordinary routine without special supervision; interact appropriately with the general public; work in coordination with or proximity to co-workers without distracting or being distracted by them; accept instructions and respond appropriately to criticism from supervisors or changes in the work setting; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and set realistic goals or make plans independent of others.

However, irrespective of the credibility issues raised by Carney's self-reports, Dr. Montoya concluded Carney remains able to handle at least simple instructions, and he is able to remember locations and work-like procedures; understand, remember, and carry out very short and simple instructions; make simple work-related decisions; ask simple questions or request assistance; be aware of normal hazards and

take appropriate precautions; and travel in unfamiliar places or use public transportation. TR 158-161.

Based on Carney's records and his examination by Dr. McPherson, Glen D. Knosp, M.D. completed a physical RFC evaluation to identify any physical impairments caused by Carney's asthma and obesity. Dr. Knosp's report, dated February 6, 2006, states Carney can occasionally lift and/or carry up to 50 pounds, and can frequently lift and/or carry up to 25 pounds; can stand, walk, or sit about six hours in an eight-hour workday; has unlimited ability to push or pull within the weight limitations previously described; can occasionally climb or crawl and can frequently balance, stoop, kneel, and crouch; has no limitations in hand manipulation, vision, or communication; and has no environmental limitations other than he must avoid concentrated exposure to extreme cold, humidity, fumes, odors, dusts, gases, and poor ventilation due to his asthma. TR 163-170. See also, TR 129 (interrogatory responses dated February 11, 2008).

Carney's application for social security disability benefits was initially denied on February 8, 2006. TR 33-37. Counsel was appointed to represent Carney in this case on March 16, 2006. TR 28. Carney was scheduled to be seen by Community Mental Health on April 7, April 28, May 25, and June 29, 2006, but he failed to attend any of these appointments. TR 202-205.

At the hearing before the ALJ on February 28, 2008, Carney testified he was not looking for a job and had not sought vocational rehabilitation services for the past ten years. TR 232. See also, TR 130 (interrogatory responses dated February 11, 2008). Carney explained he cannot work at a formal job because he is unable to focus on work and complete assigned tasks; cannot accept criticism for incomplete or poor work performance; responds to criticism with angry outbursts; and either leaves work without permission or is fired. TR 121-23, 225-26, 229, 232-34, 243, 248-49. See

also, TR 86-88 (mother's interrogatory responses); 101-104 (Matt Talbot "Work Performance Assessment").

Carney testified that he is able to perform household chores, such as cooking, cleaning and laundry, and does these chores for his roommate in exchange for free room and board, (TR 86, 231), and he can rake leaves and shovel snow.  TR 231. Although Carney does not drive, he is physically able to walk long distances and can understand and use the city's bus system.  TR 227-28.  He testified on a typical day, he gets up around 9:00 a.m.; walks to the Matt Talbott Kitchen for lunch; goes to the library to read; walks around until 5:30 p.m.; returns to the Matt Talbott Kitchen for dinner; and then walks home.  TR 235-36.  See also, TR 131 (interrogatory responses dated February 11, 2008).

In updated interrogatory responses provided just prior to the February 28, 2008 social security hearing, Carney stated he was not taking any medications because the prescribed drugs were not helping.  TR 123.  At the hearing, Carney testified he had not used prescribed medication for symptoms of mental illness for over two years. TR 240.

After Carney testified, the ALJ posed the following hypothetical question to the VE:

> If the claimant could occasionally lift or carry 50 pounds frequently, 25 pounds, no limitation in stand, sit or walk, could frequently do all postural activities and occasionally climb and crawl.  Avoid concentrated exposure to cold, humidity or fumes due to the history of asthma, but that's a mild condition at this point.  Mental I want you to consider only SVP 1 or 2 work, he is capable of simple, routine instructions that do not require extended concentration and social interaction should be only brief or superficial with coworkers or the general public.  And by this I mean it would not exceed occasional, so it would not be frequent or constant.  He doesn't have to set goals or deal

-13-

with job changes, it's just a routine, repetitive job.   So with that functional capacity could he go back to dishwashing and is there any other work that would be appropriate?

TR 248-49.   The VE responded that Carney could return to his past work as a dishwasher (kitchen helper) with 800 such jobs in the light exertion category, and about 1,624 in the medium exertion category existing in Nebraska.   TR 249. However, if, as Carney testified, he was truly unable to control his emotions and anger, cannot accept criticism, needed to avoid people, and must ignore situations or walk off the job when problems arise, Carney would not be able to keep any job on a long-term basis.   TR 250, 252-53.

On examination, Carney's counsel reminded the VE that "moderately limited" on the RFC forms means the ability to perform an activity is "impaired," and citing a dictionary, he asked the VE to assume impaired means "diminished, damaged or weakened, functioning poorly or incompetently."  TR 250-51. Carney's counsel then recited all the "moderately limited" categories listed in the mental RFC evaluation and asked the VE whether Carney could perform any job with these limitations. Assuming such facts, the VE stated there were too many moderate limitations to perform any job in the national economy on a consistent basis, particularly if impaired is defined to include "functioning poorly or incompetently," as Carney's counsel suggested.  TR 252.

## V.  ANALYSIS

Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner under Title II, which in this case is the ALJ's decision.  A denial of benefits by the Commissioner is reviewed to determine whether the denial is supported by substantial evidence on the record as a whole.  Hogan v. Apfel, 239 F.3d 958, 960 (8th Cir. 2001).

> If substantial evidence on the record as a whole supports the
> Commissioner's decision, it must be affirmed. Choate v. Barnhart, 457
> F.3d 865, 869 (8th Cir. 2006). "'Substantial evidence is relevant
> evidence that a reasonable mind would accept as adequate to support the
> Commissioner's conclusion.'" Smith v. Barnhart, 435 F.3d 926, 930
> (8th Cir. 2006) (quoting Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir.
> 2000)). "The ALJ is in the best position to gauge the credibility of
> testimony and is granted deference in that regard." Estes v. Barnhart,
> 275 F.3d 722, 724 (8th Cir. 2002).

Schultz v. Astrue, 479 F.3d 979, 982 (8th Cir. 2007). Evidence that both supports
and detracts from the Commissioner's decision must be considered, but the decision
may not be reversed merely because substantial evidence supports a contrary
outcome. Id. See also, Moad v. Massanari, 260 F.3d 887, 890 (8th Cir. 2001). In
other words, "a position can be justified even though it is not correct." Pierce v.
Underwood, 487 U.S. 552, 566 n. 2 (1988).

1.     Assessment of Carney's Credibility.

The ALJ concluded Carney's statements concerning the intensity, duration and
limiting effects of his mental health symptoms were not entirely credible. TR 16.
When assessing the credibility of a claimant's subjective allegations, the ALJ must
consider the claimant's prior work history; daily activities; duration, frequency, and
intensity of the symptoms; dosage, effectiveness and side effects of medication;
precipitating and aggravating factors; and functional restrictions. See, Polaski v.
Heckler, 739 F.2d 1320, 1322 (8th Cir.1984). An ALJ who rejects a claimant's
subjective complaints as not credible must make an express credibility determination
which explains the reasons for discrediting the complaints. Moore v. Astrue, 572
F.3d 520, 524 (8th Cir. 2009). "The ALJ need not explicitly discuss each factor,
however. . . . It is sufficient if [the ALJ] acknowledges and considers the factors
before discounting a claimant's subjective complaints." Moore, 572 F.3d at 524
(internal citations omitted).

Carney argues the ALJ's credibility decision must be reversed because it "simply stated that the testimony of the plaintiff's 'allegations regarding his symptoms can not be held to be credible.'" Filing No. 17, at CM/ECF p. 18 (quoting Tr. 19). Contrary to Carney's argument, the ALJ's decision contains an in-depth discussion of Carney's failure to continue obtaining mental health care which had, by Carney's admission, helped somewhat; his failure to take prescribed medications; and the inconsistencies in his reports of symptoms and past drug and alcohol use. In support of her credibility determination, the ALJ's written decision explains:

-- Carney failed to attend scheduled appointments at Community Mental Health, and stopped taking all medications, even though the Community Mental Health records indicated he was "much better" after taking Seroquel and Paxil, (TR 182); Carney's interrogatory responses indicated Paxil had helped "somewhat," (TR 127); and he was reportedly "tolerating his meds well," (TR 181). See, TR 16, 19.

-- In 1997, when he was nearly eighteen, Carney told Dr. Stone he had drank alcohol one time and smoked marijuana once. When speaking with Dr. Stone in 2006, Carney described heavy drug and alcohol use dating back to age twelve and ending completely at the age of twenty-two. Four days later, Carney told Dr. McPherson he was still smoking marijuana. And during his testimony on February 28, 2008, Carney said he was involved with illegal drugs, (including marijuana), for about four years but had been clean for the past six or seven years.

-- In 1997, Carney told Dr. Stone he had behavioral problems, primarily with anger control, but did not describe any hallucinations or delusions, and denied having symptoms of anxiety and depression. In 2005, while receiving treatment from Community Mental Health, Carney reported depression, social anxiety, irritability and anger control issues, but did not report losing time, or hearing or seeing things that were not there. However, in 2006, after filing his social security disability claim, Carney stated he was not honest with Community Mental Health, and reported to Dr. Stone "a largely different history, stating that he had been seeing

-16-

things, hearing things, and losing track of time since his early teen years, that he still sucked his thumb, walked aimlessly, sometimes as far as fifty blocks, not recalling how he got there, and rocked obsessively for hours;" found himself walking downtown nude one day, with no recollection of how he got there; hears "voices telling him to kill people and to take his clothes off;" "has an urge to masturbate in public;" "is attracted sexually to children;" and has "homicidal urges."  TR 17.

-- "[N]either Dr. Stone, at his initial evaluation nor Lisa Young, at any of several visits, indicated any observation" of psychotic behaviors.  TR 19.  Upon examination by Dr. Stone, "there was no behavioral evidence of hallucinations or delusions, and he seemed realistically oriented, and Dr. Stone "was unable to provide a diagnosis with reasonable certainty due to the conflicting information provided, but suggested that mixed personality disorder with antisocial features might be a correct diagnosis." TR 18.  As noted in the ALJ's report, "Dr. Montoya doubted whether [Carney] was honest about substance abuse and noted inconsistency in his self-reports."  TR 20.

The ALJ concluded "[i]n view of these multiple contradictory and unsubstantiated statements, the claimant's allegations regarding his symptoms can not be held to be credible."  TR 19.  Although "the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms," Carney's "statements concerning the intensity, duration and limiting effects of these symptoms are not entirely credible." TR 16.

The ALJ's credibility findings are supported by substantial evidence of record, and her written decision includes an express determination which explains her reasons for finding Carney's subjective complaints were not fully credible.   The ALJ's decision will not be reversed for failing to properly evaluate Carney's subjective complaints.  See e.g., Choate, 457 F.3d 865 (holding ALJ properly assessed the claimant's credibility where the ALJ considered inconsistencies of record, the absence of objective medical evidence to support the subjective complaints, the claimant's work history prior to alleged onset was sporadic, the

claimant frequently failed to show up for tests and examinations, failed to take prescribed medications, and continued to smoke despite being advised to quit).

> 2.    Failure to consider Dr. Montoya's mental RFC evaluation.

Carney claims the ALJ failed to follow or properly discredit the mental RFC opinions of Dr. Helen Montoya.  "It is the ALJ's responsibility to determine a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of his limitations.  Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir.1995).  Before the ALJ determines an applicant's RFC, "the ALJ must determine the applicant's credibility, as his subjective complaints play a role in assessing his RFC."  Ellis v. Barnhart, 392 F.3d 988, 995-96 (8th Cir. 2005).  See also, Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001) ("Before determining a claimant's RFC, the ALJ first must evaluate the claimant's credibility.").  However, an ALJ "is not required to discuss every piece of evidence submitted," and her "failure to cite specific evidence [in the decision] does not indicate that such evidence was not considered."  Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998).

When read as a whole, it is apparent the "check-box" opinions in Dr. Montoya's mental RFC report rested, in large part, on crediting Carney's self-reports. However, Dr. Montoya qualified her check-box opinions in the written explanation accompanying the report.  Specifically, Dr. Montoya noted there is a "question pertaining to the claimant's self report in terms of accuracy and consistency."  TR 161.  She commented that "the overall pattern of evidence is partially consistent" with Carney's allegations of psychological conditions, "but is not consistent with any claim of marked psychological limitations."  TR 161.  The severity of Carney's reported symptoms was "not explained by the records" in that "no provider has indicated any pervasive developmental disorders," and "the claimant does not appear impaired in attention, concentration, and ability to follow instructions."  TR 161.  "He

-18-

is socially avoidant and anxious, but these do not circumvent his ability to be around others."  TR 161.  As referenced in the ALJ's decision, "Dr. Montoya doubted whether [Carney] was honest about substance abuse and noted inconsistency in his self-reports."  Moreover, in contrast to the definition posed during Carney's cross-examination of the VE, there is nothing in Dr. Montoya's report indicating she believed a "moderate" limitation meant Carney was "functioning poorly or incompetently."  TR 250-51.

An ALJ may exclude from the hypothetical question posed to the VE "any alleged impairments that she has properly rejected as untrue or unsubstantiated." Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001).  The ALJ's opinion explains why she discredited Carney's claims that he is truly unable, (and not merely unwilling), to complete assigned tasks, accept criticism, control his anger, or finish a workday.  The ALJ was not required to accept Dr. Montoya's assessment of Carney's limitations, particularly where Dr. Montoya never saw or treated Carney, based her check-box opinions on Carney's self reports, and acknowledged that Carney's complaints were inconsistent and not supported by the observations of his mental health providers and evaluators.  Johnson, 240 F.3d at 1148  ("The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole."); Goose v. Apfel, 238 F.3d 981, 984 (8th Cir. 2001) (a non-testifying, non-examining expert's opinion cannot be considered substantial evidence to defeat the decision of the ALJ which is supported by substantial evidence).

The ALJ's decision will not be reversed for failure to fully credit the opinions of Dr. Montoya.

3.      Failure to obtain the 1997 LRC records.

Carney claims the ALJ erred in failing to obtain the 1997 records of his court-ordered evaluation by the Lincoln Regional Center.  There is no bright line test for determining when the ALJ has failed to adequately develop the record.  The determination must be made on a case by case basis.  Battles v. Shalala, 36 F.3d 43, 45 (8th Cir.1994).

The LRC record at issue was an evaluation record, not a treatment record, and was over ten years old at the time of Carney's social security hearing.  Dr. Stone's report commented that the LRC record may be helpful, but primarily to assist in determining which version of the 1997 facts was credible; those reported to Dr. Stone in 1997, or those reported to him in 2006.  Even if the LRC record was obtained, it could only add some credence to one version of the facts, or it could present another story altogether, but it would not be decisive in assessing Carney's subjective symptoms.  In other words, there is nothing to indicate the 1997 LRC record was necessary to determining Carney's level of impairment as of December 21, 2004, his alleged disability onset date.  The ALJ's decision will not be reversed for failing to obtain and review the 1997 LRC evaluation record.  Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005) (citing Shannon v. Chater, 54 F.3d 484, 488 (8th Cir.1995) ("[R]eversal due to failure to develop the record is only warranted where such failure is unfair or prejudicial.").

4.      Failure to order MMPI-II and Rorschach testing.

Dr. Stone's report stated MMPI-II and Rorschach testing "might be useful" in evaluating the validity of Carney's symptoms, but conceded they could also "end up ambiguous."  TR 197.  Although the Commissioner is authorized to request and purchase examinations of claimants, including psychiatric and psychological examinations, these examinations will be purchased by the Social Security

Administration only if needed to determine the merits of a claim.  See 20 C.F.R. § 404.1519f ("We will purchase only the specific examinations we need to make a determination in your claim.").   The record before the ALJ included reports and records assessing Carney's condition.  There is nothing of record, including within Dr. Stone's report, indicating additional psychological testing was needed to assess Carney's level of impairment.  The ALJ's decision will not be reversed for failing to order MMPI-II and Rorschach testing.  Buckner v. Apfel, 213 F.3d 1006, 1013 (8th Cir. 2000) (holding the ALJ is not required to order every available psychological test where the record contains evidence regarding the claimant's mental impairment and the functional impact of that impairment).

Upon review of the record as a whole, the court finds substantial evidence supporting the ALJ's decision.  Accordingly,

IT IS ORDERED that the findings and conclusions of the ALJ are affirmed.

January 28, 2010.                     BY THE COURT:

                                      *Richard G. Kopf*
                                      United States District Judge